CASTNER, CURRAN & BULLITT, Inc., v. HAMILTON, Collector of Customs.

(District Court, E. D. Virginia. September 3, 1921.)

1. Seamen ⬅⟿11—Statute relating to hospital expenses of alien seamen held to apply to aliens on American ship.

Act Cong. Dec. 26, 1920, providing for payment by ship of hospital expenses of alien seamen, is not a seamen's benefit statute, but was intended to supply an omission in the existing Immigration Law (Act Feb. 5, 1917 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼a et seq.]), and to make certain of the provisions of that law applicable to cargo vessels as well as to passenger ships, and applies to hospital expenses of members of crew of an American vessel who are aliens.

2. Seamen ⬅⟿13—American ship not required to return diseased seamen to foreign country.

Where aliens shipped on American vessel at New York and were taken sick on a return trip at Norfolk, Act Cong. Dec. 26, 1920, could not be construed to require the vessel to return the aliens to the country from whence they originally came, if a cure could not be effected within a reasonable time.

Mandamus proceeding by Castner, Curran & Bullitt, Inc., against Norman R. Hamilton, Collector of Customs of the Port of Norfolk. Writ denied.

Hughes, Little & Seawell, of Norfolk, Va., for petitioner.

Paul W. Kear, U. S. Atty., and H. H. Rumble, U. S. Admiralty Counsel, both of Norfolk, Va., for respondent.

GRONER, District Judge. The Winding Gulf, an American steamship, on arrival at the port of Norfolk from a European port in January, 1921, was boarded by the immigration officials, who removed to the hospital several members of the crew, found to be suffering from one or another of the diseases mentioned in section 35 of the Act of Congress of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼ss), entitled "An act to regulate the immigration of aliens to, and the residence of aliens in, the United States." Subsequently, upon the discharge of the seamen from the hospital, a claim for the cost of hospital treatment was made against the owners of the vessel, payment was refused, the ship was denied clearance, and this petition was filed, praying for a mandamus against the collector of the port.

No further statement is necessary, unless it be to mention the fact that the diseased members of the crew, for whose hospital expenses the vessel is denied clearance, were shipped from the port of New York,

and were completing a voyage from this country to Europe and return, when their diseased condition was discovered. The decision of the case involves the construction of the Act of Congress of December 26, 1920 (41 Stat. 1082) entitled "An act to provide for the treatment in hospital of diseased alien seamen," reading as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that alien seamen found on arrival in ports of the United States to be afflicted with any of the disabilities or diseases mentioned in section 35 of the act of February 5, 1917, entitled, 'An act to regulate the immigration of aliens to, and the residence of aliens in, the United States,' shall be placed in a hospital designated by the immigration official in charge at the port of arrival and treated, all expenses connected therewith, including burial in the event of death, to be borne by the owner, agent, consignee, or master of the vessel, and not to be deducted from the seamen's wages, and no such vessel shall be granted clearance until such expenses are paid or their payment appropriately guaranteed and the collector of customs so notified by the immigration official in charge: Provided, that alien seamen suspected of being afflicted with any such disability or disease may be removed from the vessel on which they arrive to an immigration station or other appropriate place for such observation as will enable the examining surgeons definitely to determine whether or not they are so afflicted, all expenses connected therewith to be borne in the manner hereinbefore prescribed; Provided, further, that in cases in which it shall appear to the satisfaction of the immigration official in charge that it will not be possible within a reasonable time to effect a cure, the return of the alien seamen shall be enforced on or at the expense of the vessel on which they came, upon such conditions as the Commissioner General of Immigration, with the approval of the Secretary of Labor, shall prescribe, to insure that the aliens shall be properly cared for and protected, and that the spread of contagion shall be guarded against."

[1] On behalf of petitioners it is insisted that the term "alien seamen," used throughout the act, has no reference or application to members of the crew of an American vessel, even though they be aliens; that by settled maritime law a seaman on an American vessel is an "American seaman," and therefore not an "alien seaman," whatever his citizenship may be; and that the act consequently applies only to the crews of foreign ships. In support of this view the cases of In re Ross, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581, The Blakeley (D. C.) 234 Fed. 959, The Laura M. Lunt (D. C.) 170 Fed. 204, The Santa Elene (D. C.) 271 Fed. 347, The Marie (D. C.) 49 Fed. 286, The Kestor (D. C.) 110 Fed. 432, The Eudora (D. C.) 110 Fed. 430, and The Ester (D. C.) 190 Fed. 216, are cited as controlling. These cases hold that service on an American vessel makes the person so serving, whatever his nationality, for the time being an "American seaman," and as such entitled to the protection and subject to the obligations of the laws passed by Congress on behalf of American seamen. Counsel for the petitioner urge with considerable force and plausibility that, if due effect be given to this doctrine, the crews of American vessels, wherever their permanent allegiance may be, are eliminated from the provisions of the act; for, they say, a person may not be an American seaman and an alien seaman at one and the same time.

This position might be tenable if the act could be regarded as original legislation complete in itself; for under such circumstances it would, perhaps, not be going too far to say that Congress, in the use of the

descriptive term found in the act, had in mind the change in the alien's status while serving on an American vessel, and intended to give effect to the same. But in the view that I take of the matter the object and purpose of Congress in passing the act of 1920 was not, as claimed by petitioner, to enact a seaman's benefit statute, but to supply an omission in the existing immigration law (Act Feb. 5, 1917), and to make certain of the provisions of that law applicable to cargo vessels as well as to passenger ships; the particular provisions being those contained in section 35 regarding the detention and treatment at the expense of the vessel of diseased alien members of a crew of any vessel carrying passengers between a port of the United States and any foreign port, to prevent thereby the spread of loathsome and contagious diseases, and to place all aliens, whether found on American or foreign vessels, freight as well as passenger, under the jurisdiction of the immigration officials, because the public safety required it.

It is true the act of 1920 is not in terms an amendment of the former act; but by reference, as well as by reason of the subject-matter treated, it is so interrelated with it that it seems impossible to escape the conclusion that Congress by its passage intended to make the penalties of section 35 of the old law apply to all vessels alike, and that this object was the real purpose of the legislation. The most casual consideration of the act of 1917 shows that Congress made no distinction in the terms "aliens" and "alien seamen." Throughout they are used interchangeably. In the section immediately preceding section 35 provision is made that any *alien seaman* (italics added) who shall land in a port of the United States contrary to the provisions of this act shall be deemed to be unlawfully in the United States, etc. It cannot, of course, be contended that this section is inoperative as applied to aliens who were of the crew of American vessels, or that their employment on such vessels entitled them by virtue of that fact to entry into the United States on any other or different footing than an alien otherwise employed. Reference to other sections of the former act but fix this conclusion more definitely, and confirm the view that the words "alien" and "alien seamen," as used there, are synonymous terms, and that, though the alien may become, for many purposes, by virtue of his signing on an American vessel, an American seamen, he nevertheless continues, so far as the laws relating to immigration are concerned, both an alien and an alien seaman.

That it was competent for Congress to legislate so as to include both classes of aliens, or, in fact, all classes of aliens, wherever employed, cannot, of course, be questioned; and it seems to me equally clear that the descriptive language employed in the act of 1920 was intended to have the same meaning as in the earlier immigration statute, which, as has been seen, it was designed to supplement and correct. In both statutes the term "aliens" and "alien seamen" must be held to have been used as commonly accepted and understood. It follows that the contention of petitioner that the rule pronounced by the Supreme Court in the Ross Case should be held applicable, and therefore controlling, is for the reasons stated overruled.

[2] It is, however, further insisted by petitioner that the intention of Congress to exempt American vessels is disclosed by reference to that portion of the act which provides that—

"In cases in which it shall appear to the satisfaction of the immigration official in charge that it will not be possible within a reasonable time to effect a cure, the return of the alien seamen shall be enforced on or at the expense of the vessel on which they came."

"Return where?" is asked, and frankly the answer is difficult to give; for, of course, it is not thinkable that Congress intended to require of the shipowner the return of the diseased seaman at the ship's expense to the country from whence he originally came, where, as in the case at bar, he shipped at an American port; and while admittedly the language used in the act is broad, and if literally construed may seem to afford ground for such contention, yet a consideration of the whole act, and of the circumstances which impelled its passage, make it quite impossible to believe that Congress intended any such unreasonable hardship, for, as was said by the Supreme Court in Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226:

"Frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

It may therefore be safely said that, without something more than is now contained in the act, the courts may be counted on, if so grotesque a demand should be made, to deny its effectiveness, and not to extend its terms so as to impose upon American shipping, already heavily burdened, absurd or impossible conditions.

Upon the whole case I am of opinion that the mandamus should be refused; and it will be so ordered.