257 F.2d 874
 Michael IERONIMAKIS, Appellant,
v.
A. SPENCE, a nonresident, individually, and as Master of THE
JOHNSTAR and THE SANTHY, E. Lemos, a nonresident, and Record
Shipping Company, S.A., Triton Shipping, Inc., Fairview
Overseas Freighters, Ltd., I.H. Mathers & Son, Ltd., and
C.M. Lemos& Co., Ltd., all foreign corporations or
associations, as owners and/or operators of The Liberian
Santhy, formerly The Johnstar, Lavino Shipping Co., a
foreign corporation or association, individually and as
Agents of the above Respondents, and Paul E. Johnson and
Duncan Barnes, U.S. Immigration Officers at Norfolk,
Virginia, T.A. Espardy, Deputy Regional Commissioner of
Immigration at Richmond, Virginia, and Gilbert Zimmerman,
U.S. Immigration Service, Richmond, Virginia, Appellees.
 No. 7634.
 United States Court of Appeals Fourth Circuit.
 Argued April 11, 1958.
Decided June 30, 1958.
 
 Burt M. Morewitz, Newport News, Va. (J. L. Morewitz, Newport News, Va., on brief), for appellant.
 Harry E. McCoy, Norfolk, Va. (Charles R. Dalton, Jr., and Seawell, Johnston, McCoy & Winston, Norfolk, Va., on brief), for appellees other than Government appellees.
 Gilbert Zimmerman, Regional Counsel, Southeast Region Immigration and Naturalization Service, Richmond, Va. (L.S. Parsons, Jr., U.S. Atty., Richmond, Va., and John M. Hollis, Asst. U.S. Atty., Norfolk, Va., on brief), for Government appellees.
 Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and THOMSEN, District Judge.
 SOBELOFF, Circuit Judge.
 
 
 1
 By this appeal an alien seaman suffering from active tuberculosis raises the question whether the Immigration Officer-in-Charge at Norfolk, Virginia, abused his discretion in ordering his return to his native country because a cure could not be effected 'within a reasonable time.' 8 U.S.C.A. 1283.[1]
 
 
 2
 Michael Ieronimakis, a Greek seaman, arrived at Newport News, Virginia, on September 21, 1957, aboard the S.S. Santhy, a Liberian vessel. Although he was afflicted with active pulmonary tuberculosis, his illness was not discovered by the Examining Medical Officer. He was granted a D-1 landing permit, which allowed him to land temporarily for a period that his vessel remained in port. 8 U.S.C.A. 1282(a).
 
 
 3
 On September 27, 1957, Ieronimakis was admitted, as a voluntary patient, to the United States Public Health Service Hospital, Norfolk, Virginia, and on the same day he filed a libel in the United States District Court for the Eastern District of Virginia against the Santhy, her owners, master, and agents, to recover his tuberculous condition. Released tuberculous condition. Released from the attachment by agreement of counsel, the Santhy departed from Newport News and sailed foreign.
 
 
 4
 After the seaman had remained in the Norfolk hospital for two and one-half months, Dr. John S. Shuttleworth, Chief of the Medical Service, on December 12, 1957, wrote to Mr. Paul E. Johnson, the Immigration Officer-in-Charge at Norfolk, Virginia, that Ieronimakis was 'fit for travel, but not fit for duty,' and that, 'it is estimated that it will require a minimum of 18-24 months more treatment.'Five days later, Johnson sent a letter to the Lavino Shipping Company, agent for the Santhy, in which, after reciting the above medical information, he declared that, 'since it is not possible to effect a cure within a reasonable time, you are hereby ordered to enforce this man's return at the expense of the owners of the SS Santhy and to insure that he will be properly cared for and protected.'
 
 
 5
 At a hearing on December 19, 1957, in connection with the admiralty suit filed by Ieronimakis, counsel for the shipowner stipulated, on behalf of his client, that if Ieronimakis was repatriated, it would give him proper medical attention, at its own expense, until he reached his maximum state of cure.[2] In open court counsel for Ieronimakis filed a 'petition for a writ of habeas corpus, application for a declaratory judgment, injunction and/or other appropriate relief,' attacking the order of repatriation. Judge Hoffman immediately issued an order to show cause and held a hearing the same afternoon. At its conclusion, the Judge found that the petitioner was not in the physical custody of any of the defendants and discharged the writ of habeas corpus. He also denied the other relief prayed, holding that 'there is nothing arbitrary' in the action taken by Johnson.
 
 
 6
 Ieronimakis then appealed to this court.[3] His principal contention is that the Immigration Officer-in-Charge failed to exercise the discretion which the Immigration and Nationality Act grants him. The statute, notes the appellant, authorizes a return of afflicted alien seamen '* * * in cases in which it appears to the satisfaction of the immigration officer in charge that it will not be possible within a reasonable time to effect a cure.' He next calls attention to the regulation of the Attorney General of the United States which provided that 'if the disability or disease is one in which a cure cannot reasonably be expected within thirty days, an order to deport shall be served * * *.' See 8 C.F.R. (1952), Sec. 253.1. Thus, concludes Ieronimakis, 'the immigration officer in charge has abdicated the functions assigned him by Congress * * * and has arbitrarily accepted the fiat of the Attorney General that any period in excess of thirty days is not reasonable.'
 
 
 7
 This argument is based upon a mistaken premise. On March 1, 1957, more than nine months before Johnson's order, the regulation cited by the appellant was superseded by a new one which places no time limit on hospitalization and provides only that an afflicted alien seaman is to be hospitalized 'for a period initially not to exceed thirty days * * *.' 8 C.F.R. (1957 Supp.), Sec. 253.1.
 
 
 8
 The effect of the current regulation is entirely opposite to that asserted by Ieronimakis. Instead of preventing the exercise of the Immigration Officer's statutory authority, the new regulation encourages it. Since the initial hospitalization period is limited to thirty days, the regulation requires some further action by the Immigration Officer-in-Charge at the end of that time, and this, of course, indicates re-appraisal of the seaman's medical condition. Thus viewed, the regulation does not conflict with the statute but, to the contrary, complements it.
 
 
 9
 Moreover, upon consideration of the facts, we cannot say that the Immigration Officer-in-Charge acted arbitrarily or contrary to law.
 
 
 10
 The medical report to Johnson was that Ieronimakis would require a 'minimum of 18-24 months more treatment.' Counsel for the appellant did not dispute the conclusion that such a protracted period of further hospitalization would be necessary, and, at the hearing, freely admitted that Ieronimakis needed 'at least' this much further care.
 
 
 11
 The statute requires that when it has been determined that it will not be possible to effect a cure within a reasonable time 'the return of the alien crewman shall be enforced on, or at the expense of, the transportation line on which he came, upon such conditions as the Attorney General shall prescribe, to insure that the alien shall be properly cared for and protected, and that the spread of contagion shall be guarded against.' The seaman contends that this requirement imposes an obligation on the Immigration Officer to insure that the alien shall be properly cared for after his repatriation, as well as during the return voyage, and complains of the Officer's 'lack of knowledge of the competency of Greek hospitals' in the instant case, although he offered no support for his contention.
 
 
 12
 The appellant contends that the statute imposes on the Immigration Service the obligation to insure that the alien be properly cared for after his repatriation. The Service replies that it has no facilities to supervise treatment in a foreign country, nor the power to control employment contracts made in foreign ports by foreign owners with alien seamen. We find it unnecessary to decide the question in this case. It is sufficient to say that the Immigration Officer should consider as one of the circumstances the facilities for treatment there and here, along with the nature of the disease, whether it is curable or incurable, and the probable length of time necessary to effect a cure, in determining whether or not it will be possible to effect a cure 'within a reasonable time.' The Government cites the language of the District Court in Castner, Curran & Bullitt v. Hamilton, D.C.E.D.Va.1921, 275 F. 203, 205, that '* * * the object and purpose of Congress in passing the act of 1920 (now Section 1283) was not, as claimed by the petitioner, (the shipowner) to enact a seaman's benefit statute, but to supply an omission in the existing immigration law. * * *' The quoted language, however, was used in a different mood, not to apply a strict rule against alien seamen, but rather to justify the extension of hospitalization to afflicted alien crewmen serving on American vessels as well as those on foreign ships.
 
 
 13
 The Castner case was one in which an American shipowner brought mandamus proceedings against the immigration officials who had denied clearance for failing to pay the cost of an alien crewman's hospitalization. The shipowner contended that the Act of 1920 applied only to 'alien seamen' and that all seamen on American vessels are 'American seamen.' It was in answer to this contention that Judge Groner called the Act of 1920 an immigration law, and said that 'though the alien may become, for many purposes, by virtue of his signing on an American vessel, an American seaman, he nevertheless continues, so far as the laws relating to immigration are concerned, both an alien and an alien seaman.' To use the quoted language in the manner suggested by the Government would in our judgment subvert its spirit and intent. It was not meant to authorize the Immigration Officer to ignore the dictates of humanity in determining how long a time is 'reasonable' in a given case.
 
 
 14
 The instant case is unusual, because the shipowners, in the admiralty suit, have agreed to continue the treatment of the alien in his native country until a maximum cure is effected. The District Judge acted properly in requiring such a pledge in the admiralty suit, although, strictly speaking, he may not have been authorized to require such an agreement in this habeas corpus proceeding.
 
 
 15
 We cannot say that Ieronimakis' repatriation was ordered without due regard for his safety. The Immigration Officer acted only after being advised that the seaman was 'fit for travel.' The shipowner's agent was informed that Ieronimakis was 'not fit for duty,' and was ordered 'to insure that he will be properly cared for and protected.' The record, moreover shows that, pursuant to the order, passage for the seaman was obtained aboard a vessel staffed by a doctor and nurses.
 
 
 16
 We hold that in the factual context of this case the District Judge correctly decided that there had been no abuse of discretion by the Immigration Officer. 5 U.S.C.A. 1009, Sec. 10, Administrative Procedure Act; Savelis v. Vlachos, 4 Cir., 1957, 248 F.2d 729, 731.
 
 Accordingly, the judgment below will be
 
 17
 Affirmed.
 
 
 
 [1]
 8 U.S.C.A. '1283. Hospital treatment of alien crewmen afflicted with certain diseases
 'An alien crewman, including an alien crewman ineligible for a conditional permit to land under section 1282(a) of this title, who is found on arrival in a port of the United States to be afflicted with any of the disabilities or diseases mentioned in section 1285 of this title, shall be placed in a hospital designated by the immigration officer in charge at the port of arrival and treated, all expenses connected therewith, including burial in the event of death, to be borne by the owner, agent, consignee, commanding officer, or master of the vessel or aircraft, and not to be deducted from the crewman's wages. No such vessel or aircraft shall be granted clearance until such expenses are paid, or their payment appropriately guaranteed, and the collector of customs is so notified by the immigration officer in charge. An alien crewman suspected of being afflicted with any such disability or disease may be removed from the vessel or aircraft on which he arrived to an immigration station, or other appropriate place, for such observation as will enable the examining surgeons to determine definitely whether or not he is so afflicted, all expenses connected therewith to be borne in the manner hereinbefore prescribed. in cases in which it appears to the satisfaction of the immigration officer in charge that it will not be possible within a reasonable time to effect a cure, the return of the alien crewman shall be enforced on, or at the expense of, the transportation line on which he came, upon such conditions as the Attorney General shall prescribed, to insure that the alien shall be properly cared for and protected, and that the spread of contagion shall be guarded against. June 27, 1952, c. 477, Title II, ch. 6, 283, 66 Stat. 221.'
 Sec. 1285. '* * * tuberculosis in any form. * * *'
 
 
 [2]
 Although, because of subsequent developments, the shipowner sought to repudiate the stipulation, it has since reaffirmed its obligation in a letter from its counsel, which has been filed with the Clerk of this Court
 
 
 [3]
 The Government has argued that certain events which occurred after the decision below have mooted this appeal and that this Court has lost jurisdiction over the controversy. Since these events were not clearly presented by the record before us, however, we are unable to pass on their legal effect. As the Government, in its brief, admitted, 'The final administrative order, and the record supporting it, entered in the deportation hearing in New York City are not part of the Court record now before this Court on appeal.'