**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

POTENCIANO L. AGGARAO, JR.,
          *Plaintiff-Appellant,*

v.

MOL SHIP MANAGEMENT COMPANY,
LTD.; NISSAN MOTOR CAR CARRIER
COMPANY, LTD., trading as Nissan
Carrier Fleet; WORLD CAR                No. 10-2211
CARRIERS, INCORPORATED,
          *Defendants-Appellees,*

          and

JOHN DOE A; JOHN DOE B; JOHN
DOE C,
          *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:09-cv-03106-CCB)

Argued: January 26, 2012

Decided: March 16, 2012

Before KING and DUNCAN, Circuit Judges, and
J. Michelle CHILDS, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Duncan and Judge Childs joined.

---

**COUNSEL**

**ARGUED:** Paul Thomas Hofmann, HOFMANN & SCHWEITZER, New York, New York, for Appellant. M. Hamilton Whitman, Jr., OBER, KALER, GRIMES & SHRIVER, PC, Baltimore, Maryland, for Appellees. **ON BRIEF:** David Warren Skeen, Meighan Griffin Burton, WRIGHT, CONSTABLE & SKEEN, LLP, Baltimore, Maryland; Joseph P. Moschetta, Stephen P. Moschetta, THE MOSCHETTA LAW FIRM, PC, Washington, D.C., for Appellant. Carla Napier Murphy, OBER, KALER, GRIMES & SHRIVER, PC, Baltimore, Maryland, for Appellees.

---

**OPINION**

KING, Circuit Judge:

Plaintiff Potenciano L. Aggarao, Jr., a citizen of the Philippines, brought suit against MOL Ship Management Company, Ltd., Nissan Motor Car Carrier Company, Ltd., trading as Nissan Carrier Fleet, and World Car Carriers, Incorporated (collectively, the "defendants"), for damages arising from severe injuries he sustained aboard the M/V Asian Spirit in the Chesapeake Bay near Baltimore.[1] Aggarao's Complaint alleged multiple claims against the defendants, including unseaworthiness, maintenance and cure, breach of contract,

---

[1]The Complaint also initially named as defendants Mitsui O.S.K. Lines, Ltd., World Marine Company, Ltd., the University of Maryland Medical System Corporation, and three unknown persons identified only as John Does. Aggarao raises no issues on appeal regarding the dismissals of those defendants.

violation of the Seaman's Wage Act, and negligence under general maritime law and the Jones Act. The district court dismissed the Complaint for improper venue, concluding that Aggarao is contractually obligated to arbitrate his claims in the Philippines. *See Aggarao v. Mitsui O.S.K. Lines, Ltd.*, 741 F. Supp. 2d 733 (D. Md. 2010) (the "Opinion"). The court contemporaneously denied as moot Aggarao's motion for a preliminary injunction, by which he sought to compel MOL and World Car to provide maintenance and cure in the United States. As explained below, we affirm in part, vacate in part, and remand.

## I.

The devastating injuries suffered by Aggarao that give rise to this civil action occurred while he was employed as an able seaman aboard the Asian Spirit. Prior to his employment thereon, Aggarao had signed several agreements that bear on the resolution of this appeal. The relevant facts are set forth below.[2]

## A.

On June 2, 2008, Aggarao entered into a "Philippine Overseas Employment Administration Contract of Employment" (the "POEA Contract") with an entity called Magsaysay Mitsui O.S.K. *See* J.A. 184.[3] The Philippine Overseas Employment Administration (the "POEA") — part of the Philippine Ministry of Labor and Employment — had prepared the POEA Contract, which provides that "the terms and conditions in accordance with [POEA] Department Order No. 4 and

---

[2]Our recitation of the facts is drawn from the Opinion, the Complaint, and the parties' submissions concerning various motions, including multiple declarations and exhibits. Although we view the facts in the light most favorable to the plaintiff, they are largely undisputed.

[3]Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Memorandum Circular No. 9 . . . shall be strictly and faithfully observed." *Id.* The referenced documents in turn incorporate the "Standard Terms and Conditions Governing the Employment of Filipino Seafarers On-Board Ocean-Going Vessels" (the "POEA Terms"), which Aggarao also signed. *See id.* at 185-90. Together, the POEA Contract and the POEA Terms are intended to ensure minimum employment standards for Filipino seafarers employed by foreign corporations. Section 29 of the POEA Terms includes a mandatory arbitration clause, providing in part:

> In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators.

*Id.* at 187 (the "Arbitration Clause"). Section 31 includes a choice of law clause, specifying:

> Any unresolved dispute, claim or grievance arising out of or in connection with this Contract . . . shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants where the Philippines is a signatory.

*Id.* (the "Choice of Law Clause"). Additionally, Section 20 of the POEA Terms prescribes, in relevant part, the "liabilities of an employer when the seafarer suffers work-related injury or illness during the term of his contract . . . as follows":

> If the injury or illness requires medical . . . treatment in a foreign port, the employer shall be liable for the full cost of such medical . . . surgical and hospital treatment as well as board and lodging until the seafarer is declared fit to work or to be repatriated . . . .

> [P]ayment for injury, illness, incapacity, disability or
> death of the seafarer under this contract shall cover
> all claims arising from or in relation with or in the
> course of the seafarer's employment, including but
> not limited to damages arising from the contract,
> tort, fault or negligence under the laws of the Philip-
> pines or any other country.

*Id.* at 186 (the "Liability Clause").

For purposes of the POEA Contract, Magsaysay Mitsui, a Philippine crewing company, was the agent of defendant MOL — a Japanese company managing the officers and crew of the Asian Spirit. Defendant World Car, a Liberian company, owned, operated, and manned the Asian Spirit. Aggarao was hired as a crewman of the Asian Spirit, which was chartered by defendant Nissan, a Japanese entity. Under the terms of its charter agreement with World Car, Nissan was responsible for instructing the ship on its destination and cargo.

One day after signing the POEA Contract, on June 3, 2008, Aggarao entered into a "Seafarers Employment Contract" (the "Seafarers Contract") with Magsaysay Mistui that incorporated the terms of a collective bargaining agreement called the "IBF JSU/AMOSUP-IMMAJ CBA" (the "CBA"). *See* J.A. 191-221. World Car and Nissan were bound to the CBA through an "IBF [International Bargaining Forum] Special Agreement." *See id.* at 1421-22. On about June 3, 2008, the POEA approved the Seafarers Contract. With Aggarao on board as a crewman, the Asian Spirit thereafter departed from Manila.

## B.

On August 13, 2008, the Asian Spirit was navigating in the Chesapeake Bay en route to the Port of Baltimore where it was scheduled to load a cargo of motor vehicles. Aggarao was working to raise floor panels in the ship in preparation for

receipt of the cargo load. As the crew began raising the floor panels, Aggarao was crushed between a deck lifting machine and a pillar. He was promptly airlifted to the nearby University of Maryland Shock Trauma Center (the "UM Trauma Center"), where he was treated for severe injuries to his spinal column and cord, his chest cavity, and his abdomen. Dr. Thomas M. Scalea performed emergency surgery for "litigation of vessels, bowel resection, and splenectomy." J.A. 533. During the next few weeks, Aggarao endured a barrage of additional surgeries and medical procedures, twelve in all.

On October 15, 2008, Aggarao was discharged from the UM Trauma Center and, on Dr. Scalea's recommendation, transferred within the University of Maryland Medical System ("UMMS") to Kernan Orthopaedics and Rehabilitation for follow-up treatment, including physical and occupational therapy in the spinal cord unit. Aggarao presented to Kernan with "T4 ASIA A paraplegia with complete paralysis" and "absent bowel and bladder control." J.A. 539. Dr. Henry York was Aggarao's physician at Kernan. On November 18, 2008, Dr. York reported that Aggarao had made "excellent progress towards his goals of independent functional mobility" in terms of, inter alia, "bed mobility," and "transfers between his bed and his wheelchair [and] between level surfaces." *Id.* Dr. York contemplated that Aggarao would receive "further physical therapy" and recommended that he acquire an ultralightweight wheelchair, so that he could achieve optimal mobility when he returns to the Philippines. *Id.* at 539-42.

According to a declaration of the defendants' paralegal, made on June 4, 2010, Dr. York and a physical therapist had agreed, at a meeting eighteen months earlier, on December 4, 2008, that Aggarao "had reached as full a recovery as Kernan Hospital could provide him"; "was able to care for himself [as] he had been taught how to catheterize himself[,] manage his wheelchair[, and] get in and out of a car"; and "was ready for the trip to the Philippines." J.A. 1326. By letter of December 8, 2008, the defendants informed Aggarao that, given the

extent of his rehabilitation, the owners and insurers of the Asian Spirit authorized travel arrangements for his return to the Philippines and would not be providing financial assistance to him for further medical care in the United States. Nevertheless, Aggarao declined to be repatriated to the Philippines for fear that he could not receive adequate medical treatment there. He also believed that his aging parents, who live in a remote rural area, would be unable to care for a paraplegic and he would die.

On February 25, 2009, Aggarao was discharged from Kernan and relocated to a nearby Days Inn hotel. Kernan arranged to pay, for seven days only, the costs of his room and board at the hotel, plus a nurse to make regular visits. Meanwhile, the defendants reiterated that the owners, managers, and insurers of the Asian Spirit would honor their obligations under the POEA contract and Philippine law, including providing Aggarao further medical care, but only upon his return to the Philippines. In response, Aggarao insisted that, notwithstanding his course of rehabilitation at Kernan, Dr. Scalea, his UM Trauma Center surgeon, had recommended that he remain in the United States for abdominal reconstructive surgeries. Aggarao forwarded to the defendants Dr. Scalea's letter of March 10, 2009, which explained:

> I have been caring for Potenciano Aggarao since his injury date on August 13, 2008 . . . . In my opinion, the ideal therapy for this patient is staged abdominal wall reconstruction . . . . This is a highly complicated situation and I believe it is in Mr. Aggarao's best interest to remain in the United States to have the procedures done at the Shock Trauma Center. This is a procedure best done in a tertiary care facility. More importantly, I believe that optimal results will occur if he is cared for in an institution that knows him inside and out.

J.A. 562.

Forced by financial necessity to leave the Days Inn in April 2009, Aggarao eventually moved in with a Filipino-American friend, who agreed to provide lodging and assist with his medications and personal hygiene for $100 per day.[4] Later that month, the defendants arranged for Future Care, Inc., a provider of medical care management services, to monitor Aggarao's medical needs. They also offered a one-time payment of less than $500 for Aggarao's prescriptions, if he agreed to be repatriated to the Philippines; otherwise, Aggarao would be obligated to pay for his own medical care in the United States. Aggarao rejected the proposal and instead borrowed money to pay for his medications.

C.

On June 16, 2009, Aggarao initiated this civil action in the Eastern District of New York. Shortly thereafter, on June 29, 2009, the defendants settled his bills with UMMS for hospitalization and medical treatments, in the aggregate sum of $944,530.99. The defendants then advised Aggarao that they were "ready and willing" to arrange for his repatriation to the Philippines and to "provide further appropriate medical care in that country," but would "have no further responsibility for, and will not pay for, any further medical care" in the United States. J.A. 1356.[5]

In preparation for his abdominal reconstructive surgeries, Aggarao underwent weekly skin expansion procedures between August and October 2009. In the meantime, he applied to UMMS for medical assistance and was examined by Dr. Ana T. Acevedo. In her October 30, 2009 report, Dr.

---

[4]As of April 2010, Aggarao owed his Filipino-American caretaker approximately $33,000.

[5]On this record, the defendants have adhered to their ultimatum that they will have no further responsibility for "any further needed care" in the United States. Indeed, they have not provided any financial assistance to Aggarao for maintenance and cure for nearly three years, since June 2009.

Acevedo concluded that Aggarao would "need appropriate and diligent medical care for the rest of his life," and that he was "unlikely to have the expert medical care that he needs" if he returned to his "small village in the Philippines." J.A. 679.

On November 17, 2009, these proceedings were transferred to the District of Maryland. Shortly thereafter, on January 5, 2010, Dr. Scalea performed the first of two planned abdominal reconstructive surgeries on Aggarao. Following that surgery, Dr. Scalea observed in his report that Aggarao will require a second stage abdominal reconstruction and concluded again that it was in the "best interest of Mr. Aggarao to remain in the United States to have the follow-up care that he requires and additional operative procedures done here at the Shock Trauma Center." J.A. 690. Aggarao was discharged from the UM Trauma Center on January 9, 2010, but was rushed back to the Center two days later due to complications. Thereafter, he was referred to a shelter called Healthcare for the Homeless.

On January 21, 2010, the defendants moved, inter alia, to dismiss the Complaint for improper venue under Rule 12(b)(3), pursuant to the Arbitration Clause. Aggarao opposed the motion to dismiss, arguing that the Arbitration Clause was not enforceable. Aggarao also served multiple discovery requests on the defendants; however, the parties thereafter agreed that no discovery would be conducted pending the court's disposition of the venue and arbitration issues.

Aggarao was subsequently moved from the homeless shelter to his Filipino-American caretaker's home. He was then examined by Elizabeth Davis, a rehabilitation counselor at Life Care Resources, Inc. Davis's report of February 1, 2010, observed, inter alia, that Aggarao was "at extreme risk for further serious complications including infection and autonomic dysreflexia which is an emergency situation," and would need a "high level of care" to function and to maintain his health.

J.A. 727-37. Davis also prepared a Life Care Plan, detailing the treatment and maintenance that Aggarao would require. On February 18, 2010, Dr. Scalea performed another surgical procedure, for a bed sore, at the UM Trauma Center. At that time, Aggarao learned that he would be eligible for Medicaid benefits for emergency care only. On February 24, 2010, he was again discharged from the UM Trauma Center, and transferred for rehabilitation to the UMMS-affiliated University Specialty Hospital. Aggarao was approved for rehabilitation on the possibility that it would be paid through the Medicaid program. On March 11, 2010, UMMS filed a lien against him for more than $91,000 in unpaid medical bills.[6]

Aggarao thereafter retained Dr. Richard P. Bonfiglio, a specialist in rehabilitation, to conduct a medical evaluation and review his medical records. Dr. Bonfiglio's April 19, 2010 report explained that Aggarao "needs extensive, ongoing daily, medical and rehabilitative care [as] delineated in the Life Care Plan developed by Elizabeth Davis, RN." J.A. 930. Bonfiglio also concluded that Aggarao "can best receive this level of care in the United States," and therefore

> strongly advocate[d] that [Aggarao] not be deported for the complexity of his current medical condition would likely lead to his premature death, if he is forced from the United States. [Aggarao] would not receive the level of medical care that he needs in other countries especially the Philippines.

*Id.*

Two days later, on April 21, 2010, Aggarao filed a motion in the district court seeking a preliminary injunction, compelling MOL and World Car to, inter alia, provide maintenance

---

[6]According to Aggarao's calculations, UMMS's lien was underinclusive, in that he then had more than $130,000 in unpaid medical bills and expected to incur thousands more.

and cure for him in the United States, until he could attain maximum medical cure (the "injunction request").[7] In opposition to the injunction request, the defendants submitted the declaration of Dr. Natalio G. Alegre, a general surgeon practicing at St. Luke's Medical Center in Manila. Dr. Alegre explained that St. Luke's is a "world-class institution," "the foremost hospital in the Philippines," and "a tertiary care facility" with "state-of-the-art facilities." J.A. 1362-63. Dr. Alegre had apparently reviewed Aggarao's medical records and concluded that "[n]othing has been done in the United States for Mr. Aggarao during that period that could not have been done to equal effect in the Philippines," including his abdominal wall reconstruction. *Id.* at 1364. Dr. Alegre also explained that it was "well within the capability of practioners and institutions in the Philippines" to provide Aggarao with the level of care described in the Life Care Plan prepared by Davis. *Id.* Dr. Alegre disagreed with Dr. Bonfiglio's conclusions, deducing that,

> [w]ith the appropriate medical accompaniment, Mr. Aggarao could safely travel from the United States to the Philippines. His medical, surgical, rehabilitative, and psychiatric needs can all be handled in the Philippines.

*Id.* at 1365.

## D.

On September 30, 2010, the district court issued its Opinion in this case, ruling that the Arbitration Clause was enforceable, and that Aggarao was equitably estopped from

---

[7]By the injunction request, Aggarao alleged that the owner of the Asian Spirit (World Car) and his employer (MOL) have general maritime duties to provide maintenance and cure. Although his Complaint also alleged a maintenance and cure claim against Nissan, Aggarao did not seek injunctive relief against that defendant.

pursuing in federal court his separate claims against World Car and Nissan, which were nonsignatories to the POEA Contract. Hence, the court concluded that the Arbitration Clause "must be enforced" and dismissed Aggarao's claims against MOL, World Car, and Nissan for improper venue. *See Aggarao*, 741 F. Supp. 2d at 743. Without further elaboration, the court denied as moot the defendants' motion for summary judgment and the injunction request.[8] Finally, the court ordered that the case be closed.

On October 21, 2010, Aggarao filed a timely notice of appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's determination on arbitrability of a civil action. *See United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001). We also review de novo a district court's dismissal of a complaint for improper venue on the basis of a forum-selection clause. *See Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006).[9] On a motion to dismiss under Rule 12(b)(3), the court is permitted to consider evidence outside the pleadings. *Id.* A plaintiff is obliged, however, to make only a prima facie

---

[8]With respect to the injunction request, the court observed by footnote that it had "no doubt and indeed regret[ted] the severity of [Aggarao's] medical condition [but] that [did] not alter the requirement for arbitration in this case." *Aggarao*, 741 F. Supp. 2d at 743 n.10.

[9]Although our *Sucampo Pharm.* decision involved a forum-selection clause, the Supreme Court has characterized an arbitration clause as "a specialized kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974). In particular, the Court has deemed foreign arbitration clauses to be a "subset of foreign forum selection clauses." *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995). And, as we explained in *Sucampo Pharm.*, "a motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." *Id.* at 550.

showing of proper venue in order to survive a motion to dismiss. *See Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). In assessing whether there has been a prima facie venue showing, we view the facts in the light most favorable to the plaintiff. *See Global Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 224 (2d Cir. 2011).

We review for abuse of discretion a district court's denial of a preliminary injunction. *See Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). When a motion for a preliminary injunction is denied as moot, there are "no factual or legal findings for this court to review." *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 620 (6th Cir. 2003). Rather, in such cases, we must determine whether the court abused its discretion by failing to exercise it. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) (explaining that abuse of discretion manifests "in a failure or refusal . . . actually to exercise discretion").

## III.

### A.

In 1958, UNESCO adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). The United States acceded to the Convention in 1970, and Congress implemented it by enacting Chapter 2 of Title 9 of the United States Code ("the Convention Act").[10]

---

[10]The Ninth Circuit recently explained the relationship of the Federal Arbitration Act (the "FAA") to the Convention Act:

> Federal arbitration law is codified in the three chapters of Title 9 of the United States Code [only two of which are relevant here]. The [FAA] comprises the first chapter. *See* 9 U.S.C. §§ 1-14. [The legislation] implementing the treaty . . . commonly called the Convention Act, comprises the second chapter. *See* U.S.C. §§ 201-208.

*Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1152–53 (9th Cir. 2008); *accord Bautista v. Star Cruises*, 396 F.3d 1289, 1292 n.2 (11th Cir.

"The goal of the Convention," the Supreme Court has explained, "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

In deciding whether to enforce a foreign arbitration clause implicating the Convention Act, courts have emphasized four jurisdictional factors:

> that (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 654–55 (9th Cir. 2009) (internal quotation marks omitted). When these jurisdictional prerequisites have been satisfied, a district court is obliged to order arbitration "unless it finds that the [arbitration] agreement is null and void, inoperative or incapable of being performed." Convention, art. II(3).

In addressing the four jurisdictional factors, Aggarao acknowledges that two of them are satisfied. First, the Arbitration Clause provides for arbitration in the Philippines,

---

2005) (referring to Chapter 1 as "FAA" and to Chapter 2 as the "Convention Act," even though "[c]ourts often refer to the entirety of title 9 as the Federal Arbitration Act"). To avoid confusion, we adopt the same nomenclature as those circuits, referring to Chapter 1 of Title 9 as the "FAA" and to Chapter 2 as the "Convention Act."

which is a signatory of the Convention (Factor Two), and, second, he is not a citizen of the United States (Factor Four). Nevertheless, Aggarao contends that jurisdictional Factors One and Three have not been satisfied. More specifically, he maintains that there was never an agreement to arbitrate (Factor One) because the Seafarers Contract and the CBA superseded — or at least modified — the POEA Contract, and thus annulled the Arbitration Clause. Moreover, Aggarao posits that an agreement to arbitrate could not have arisen from a commercial legal relationship (Factor Three) because a seaman's employment contract is exempt from the FAA definition of "commerce."

Notwithstanding the jurisdictional prerequisites, Aggarao asserts that the Arbitration Clause cannot divest the district court of jurisdiction over his Seaman's Wage Act claim and, by extension, his other claims for relief. He also suggests that enforcement of the Arbitration Clause and the Choice of Law Clause would contravene the public policy of this country by forcing him to waive his statutory claims under the Jones Act and the Seaman's Wage Act. Even if he is required to arbitrate his claims against MOL, however, Aggarao insists that he should be able to proceed against World Car and Nissan in the district court, rather than in arbitration in the Philippines, because they are not signatories to the POEA Contract and owed duties to him that are distinct from those owed by MOL. We assess Aggarao's contentions in turn.

1.

First, Aggarao contends that there is no binding arbitration agreement because the Seafarers Contract and the CBA constituted a novation that served to supersede the POEA Contract. A contractual novation has four elements: "(1) [a] previous valid obligation; (2) the agreement of all parties to [a] new contract; (3) the validity of such new contract; and (4) the extinguishment of the old contract by the substitution of the new contract." *Holder v. Maaco Enterps.*, 644 F.2d 310,

312 n.2 (4th Cir. 1981) (applying Maryland law) (internal quotation marks omitted). Aggarao's effort to show a novation with respect to the Arbitration Clause fails on the fourth element.

The Opinion accurately observed that "there is no indication, either expressed or implied, that both parties intended the Seafarers Contract to constitute a novation of the POEA Contract." *Aggarao*, 741 F. Supp. 2d at 739. Neither the Seafarers Contract nor the CBA contains any language extinguishing the POEA Contract. Rather, the CBA anticipates the existence of "an individual Contract of Employment" between the employer (MOL) and the seafarer (Aggarao), e.g., the POEA Contract, yet the CBA specifies that it is to be "deemed . . . incorporated into and to contain the terms and conditions of employment." J.A. 193. Moreover, the POEA Contract itself provides that any alterations agreed to by the parties and approved by the POEA "shall be deemed an integral part of the [POEA Terms]." *Id.* at 184. That provision is applicable because the POEA approved the Seafarers Contract incorporating the CBA. And, the Arbitration Clause contemplates that the parties may be covered by a collective bargaining agreement outside the POEA Contract, such as the CBA, but nevertheless requires that arbitration be conducted in such circumstances. *See id.* at 187.

Alternatively, Aggarao contends that the Seafarers Contract and the CBA at least modified the POEA Contract so as to repeal the Arbitration Clause. As we have explained, however, "[w]hen a party seeking to avoid arbitration contends that the clause providing for arbitration has been superseded by some other agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." *Zandford v. Prudential–Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (internal quotation marks omitted). Aggarao maintains that such a "clear implication" is found in Article 28.5 of the CBA, which provides, in pertinent part, that "[a]ny payment [for permanent disability sustained during the course

of a seafarer's employment], shall be without prejudice to any claim for compensation made in law." J.A. 205. Aggarao interprets Article 28.5 to authorize actions at law for personal injury claims, which, he asserts, countermands the Arbitration Clause.

Put succinctly, we are unwilling to accept Aggarao's construction as the proper and clear implication of Article 28.5. In construing an arbitration agreement under "common law principles of contract interpretation . . . due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001) (internal quotation marks and alteration omitted). It is elementary that a contract term must "be construed in connection with the [contract's] other provisions, so that if possible, or so far as is possible, they may all harmonize." *Chi. Ry. Equip. Co. v. Merch. Bank*, 136 U.S. 268, 281 (1890); *see Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267 (4th Cir. 2011) (observing that "whether one of two provisions in a contract controls is irrelevant where . . . the two provisions can be comfortably read together" (internal quotation marks omitted)). This rule applies to our holistic assessment of the POEA Contract, the Seafarer's Contract, and the incorporated CBA, in that these agreements concern the same subject matter (the terms and conditions of Aggarao's employment) and were executed by the same parties within one day of each other. *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 868 (D.C. Cir. 2008) (according effect to arbitration clause found in one contract for dispute arising under separate contract because contracts were made by same parties and concerned same subject matter); *cf. Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 571 (4th Cir. 1998) (construing broad arbitration clause in one contract to encompass dispute originating from another contract that had no arbitration clause).

Read together, the Arbitration Clause and Article 28.5 authorize Aggarao to pursue his legal claims through arbitra-

tion. Harmonizing those two provisions in that manner satisfies "two prime interpretive dictates regarding judicial review [—] that *all* contractual provisions be read to make sense, and that arbitration be favored." *See H.C. Lawton, Jr., Inc. v. Truck Drivers, Chauffeurs & Helpers Local Union No. 384*, 755 F.2d 324, 329 (3d Cir. 1985). Even if the Arbitration Clause and Article 28.5 could not be so harmonized, we agree with the district court that there is, at best, an ambiguity as to how Aggarao "may proceed to recover compensation," since Article 28.5 does not "provide access to a particular court or other forum." *See Aggarao*, 741 F. Supp. 2d at 740. Accordingly, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, [even where] the problem at hand is the construction of the contract language itself." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). This "heavy presumption . . . in favor of arbitrability is particularly applicable [where, as here,] the arbitration clause is broadly worded." *See Levin*, 634 F.3d at 266-67. In these circumstances, the court correctly ruled that neither the Seafarer's Contract nor the CBA superseded or revoked the Arbitration Clause.

2.

Next, Aggarao contends that the Arbitration Clause is not subject to the Convention Act, which applies only to disputes arising from commercial legal relationships involving foreign countries. *See* 9 U.S.C. § 202. In this respect, he maintains that the POEA Contract did not create a commercial legal relationship because the FAA is the source of the definition of "commercial," and it exempts from that definition the employment contracts of a seaman. In particular, Aggarao directs us to that part of the FAA defining the term "commerce," providing that "nothing herein contained shall apply to contracts of employment of seamen." 9 U.S.C. § 1 (the "§ 1 exemption"). Aggarao asserts that § 1 defines that which is commercial for all of Title 9, including § 202, which restricts

the scope of the Convention Act to commercial legal relationships. Alternatively, he argues that § 208 makes the § 1 exemption applicable to § 202. Otherwise, we should resolve any ambiguity by resorting to legislative history, which, according to Aggarao, plainly shows that the § 1 exemption was meant to apply to § 202.

As the Opinion observed, Aggarao's contentions have been squarely rejected by at least three of our sister circuits, which have held that the § 1 exemption does not apply to the Convention Act. *See Aggarao*, 741 F. Supp. 2d at 741. Section 202 provides, in relevant part, that an agreement falls under the Convention Act if it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial, *including* a transaction, contract, or agreement *described in section 2* of [the FAA]." 9 U.S.C. § 202 (emphasis added). Section 2 recognizes as enforceable an arbitration clause "in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration." *Id.* § 2. As the Supreme Court has observed, "a contract evidencing a transaction involving commerce" includes an employment contract. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001).

The Fifth and Eleventh Circuits have explained that the reference in § 202 to § 2 does not exclusively limit the definition of "commercial" to the contracts described in § 2, but is illustrative of the types of commercial legal relationships meant to be covered by § 202. *See Bautista*, 396 F.3d at 1298; *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 274 (5th Cir. 2002). Significantly, § 202 "makes no mention" of the exemption found in § 1. *Id.* Moreover, as the Ninth Circuit has explained, the § 1 exemption "is neither part of the definition of commerce . . . nor a limitation on which relationships are 'considered as commercial' [r]ather, it operates as an exemption." *Rogers*, 547 F.3d at 1155. That is, the exemption "does not state that . . . employment contracts are not 'considered as commercial'[;] it states that . . . *even though* their employment

contracts are considered commercial, the FAA does not apply to them." *Id.* In any case, § 1 does not incorporate its exemption into § 202.[11]

Nor is the § 1 exemption incorporated by § 208. As the Ninth Circuit observed in *Rogers*, § 208 "incorporates the provisions of the FAA unless they are 'in conflict with' either the Convention Act or the Convention." *Id.* at 1155. Incorporating the § 1 exemption would create just such a conflict because "[n]either the Convention nor the limiting language ratifying the Convention contemplate any exception for seamen employment contracts or employment contracts in general." *See Francisco*, 293 F.3d at 274. Instead, Congress limited the applicability of the Convention only to arbitration agreements arising from commercial legal relationships, and, as explained above, the § 1 exemption does not define what is commercial.

Because § 202 is "plain and unambiguous . . . there is no need for recourse to legislative history." *See Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 207 (4th Cir. 2009).[12]

---

[11]We are also unpersuaded that the heading of § 1 — "exceptions to operation of title" — supports Aggarao's position that the seaman's employment contract exemption is meant to apply throughout Title 9, including in § 202. Although "words in the title of a statute or the heading of a section can shed light on the meaning of an ambiguous word or phrase in the text of the statute, they cannot create an ambiguity where none otherwise would exist." *Francisco*, 293 F.3d at 275 (internal quotation marks omitted); *accord Bautista*, 396 F.3d at 1298 n.12.

[12]The legislative history that Aggarao points to — an ambassador's testimony before a Senate committee — is unavailing. The ambassador testified that

> the definition of commerce contained in section 1 of the original [FAA] is the national law definition for the purposes of the declaration. A specific reference, however, is made in section 202 to section 2 of title 9, which is the basic provision of the original [FAA].

S. Comm. on Foreign Relations, Foreign Arbitral Awards, S. Rep. No. 91-702, at 6 (1970). Even if the ambassador believed the § 1 exemption "should apply to the Convention Act, his views as a single State Department official are a relatively unreliable indicator of statutory intent." *Bautista*, 396 F.3d at 1298; *see Francisco*, 293 F.3d at 276 (same).

Hence, the § 1 exemption does not apply and we agree with the district court that the Arbitration Clause falls within the ambit of the Convention Act.

3.

Aggarao next contends that, even if the Convention Act's jurisdictional prerequisites are satisfied, the Arbitration Clause cannot divest the district court of jurisdiction because the Seaman's Wage Act entitles him to access a federal court to resolve his claim thereunder. *See* 46 U.S.C. § 10313(i) (providing federal "courts are available to seamen for enforcement" of wage claims).[13] And, because "[r]etention by the district court of [seamen] wage claims requires the court, absent 'special circumstances,' to exercise jurisdiction over all claims," he asserts that the Arbitration Clause has no effect in this case. *See Morewitz v. Andros Compania Maritima, S.A.*, 614 F.2d 379, 381 n.3 (4th Cir. 1980). Aggarao, however, misconstrues the authority on which he relies.

The Ninth and Eleventh Circuits have determined that "[t]he Convention Act expressly compels the federal courts to enforce arbitration agreements," notwithstanding the jurisdiction conferred on such courts to adjudicate Seaman's Wage Act claims. *See Rogers*, 547 F.3d at 1156 (citing *Lobo v. Celebrity Cruises, Inc.*, 488 F.3d 891, 894-95 (11th Cir. 2007)). Our *Morewitz* decision did not rule otherwise. There, we affirmed the district court's assessment that it lacked jurisdiction over a Seaman's Wage Act claim because the claim was not asserted in good faith. *Morewitz* did not involve a foreign arbitration agreement, and thus we had no occasion to

---

[13]Aggarao alleged that the defendants owed him nominal wages for work performed before the accident. Subsections (e) and (f) of § 10313 of Title 46 provide for the payment of wages within certain specified times, depending on whether the seaman makes a demand before or after expiration of the voyage. Subsection (i) renders § 10313 applicable to "a seaman on a foreign vessel when in a harbor of the United States."

consider the Convention Act. With that issue now squarely before us, we agree with our sister circuits that the Convention Act supplanted in part the Seaman's Wage Act, requiring a federal court to refer to arbitration seamen wage claims and any other claims subject to an enforceable arbitration agreement.

4.

Next, Aggarao persists in his view that arbitration of his Jones Act and Seaman's Wage Act claims in the Philippines will contravene the public policy of the United States.[14] He portends that, pursuant to the Choice of Law Clause, the arbitrator would apply the law of the Philippines to the exclusion of otherwise applicable American law, thereby denying his right to pursue his federal statutory claims. Aggarao maintains that such a deprivation of his rights contravenes our public policy, as established by the "prospective waiver doctrine" first articulated by the Supreme Court in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985). There, the Court deemed enforceable an arbitration clause requiring the parties to arbitrate, inter alia, statutory antitrust claims in Japan. Addressing concerns that a choice of law

---

[14]In similar fashion to the Seaman's Wage Act, the Jones Act provides a statutory remedy and federal forum to resolve disputes between seamen and their employers. Whereas the Seaman's Wage Act governs contractual disputes concerning compensation for services performed, the Jones Act addresses actions in tort arising from workplace injuries:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

46 U.S.C. § 30104. The Jones Act thereby "incorporates the judicially developed doctrine of liability of the Federal Employers Liability Act," which governs the injury claims of railway workers. *See Martin v. Harris*, 560 F.3d 210, 216 (4th Cir. 2009) (internal quotation marks omitted).

provision would "wholly . . . displace American law" (even though the parties had stipulated that domestic law would apply to the antitrust claims), the Court "merely note[d]" by footnote that,

> in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.

*Mitsubishi*, 473 U.S. at 637 n.19. Ten years later, the Court qualified the doctrine, recognizing that a prospective waiver would contravene public policy only when there is "no subsequent opportunity for review" in federal court. *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995).

Purporting to follow the Court's mandate in *Mitsubishi* and *Sky Reefer*, the Eleventh Circuit opined that an arbitration agreement could be deemed "null and void as a matter of public policy" if it is clear that the arbitrator would not apply the law of this country, and no assurance of court review would follow. *See Thomas v. Carnival Corp.*, 573 F.3d 1113, 1123-24 & n.17 (11th Cir. 2009). Aggarao urges that we apply the reasoning of *Thomas* and find the Arbitration Clause null and void as against public policy. As the Eleventh Circuit has more recently explained, however, its decision in *Thomas* is problematic on several grounds. *See Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1277-80 (11th Cir. 2011). Most critically, *Thomas* strayed from Supreme Court precedent by invoking the "null and void" defense in applying the prospective waiver doctrine. In *Mitsubishi* and *Sky Reefer*, the Court specified instead that a prospective waiver would be unenforceable "as against public policy." *Sky Reefer*, 515 U.S. at 540. The Convention prescribes that the null-and-void defense be interposed at the first stage of the arbitration-related court proceedings, the "arbitration-enforcement stage" — i.e., when

a district court is "considering an action or motion to 'refer the parties to arbitration.'" *Lindo*, 652 F.3d at 1263 (quoting Convention, art. II(3)). The public policy defense, on the other hand, may only be asserted at the second stage of the arbitration-related court proceedings, the "award-enforcement stage" — i.e., after an arbitration award has been made and the court is "considering whether to recognize and enforce an arbitral award." *Id.* (citing Convention, art. V).

The Supreme Court has recognized this two-stage approach, adhering to the arbitration-enforcement and award-enforcement stages in both *Mitsubishi* and *Sky Reefer*. Confronted in *Mitsubishi* with the possibility that the law of Switzerland would govern an agreement subject to arbitration in Japan, the Court nevertheless declined "to speculate on this matter at th[at] stage in the proceedings, when Mitsubishi [sought] to enforce the agreement to arbitrate, not to enforce an award." 473 U.S. at 637 n.19. Rather, the Court indicated that a federal court would "have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of American antitrust laws has been addressed[, reserving] the right to refuse enforcement of an award where [it] would be contrary to the public policy of [the United States]." *Id.* at 638 (internal quotation marks omitted).[15]

The Eleventh Circuit's *Thomas* decision erroneously conflated the two stages of arbitration-related court proceedings,

---

[15]Similarly, in *Sky Reefer*, the Court determined that an arbitration clause was enforceable even though it provided for arbitration in Japan and expressly stated that it was to be governed by the law of Japan. The Court decided that the choice of law issue was "premature," as it had not been established "what law the arbitrators will apply . . . or whether [the plaintiff would] receive diminished protection as a result." 515 U.S. at 540. Moreover, the defendants sought "only to enforce the arbitration agreement" and the district court "retained jurisdiction over the case and [would] have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of [American] laws ha[d] been addressed." *Id.* (internal quotation marks omitted).

merging the null-and-void and public policy defenses and ruling that the arbitration agreement was "null and void *as a matter of* public policy." 573 F.3d at 1124 n.7 (emphasis added). That amalgamation was contrary to Eleventh Circuit precedent, which had previously held that the null and void defense only applies when the arbitration agreement has been "obtained through those limited situations, 'such as fraud, mistake, duress, and waiver,' constituting 'standard breach-of-contract defenses' that 'can be applied neutrally on an international scale.'" *Lindo*, 652 F.3d at 1276 (quoting *Bautista*, 396 F.3d at 1302). The "narrow scope of the 'null and void' clause is in complete accord with the prevailing authority in other circuits." 652 F.3d at 1277 (collecting cases).

Moreover, the problem with applying the public policy defense at the first stage of the arbitration-related court proceedings — the arbitration-enforcement stage — is that the defense "cannot be applied 'neutrally on an international scale,' as each nation operates under different statutory laws and pursues different policy concerns." *See Lindo*, 652 F.3d at 1278. In applying the Convention's provisions, the district courts "must not only observe the strong policy favoring arbitration, but must also foster the adoption of standards which can be uniformly applied on an international scale." *I.T.A.D. Assocs., Inc. v. Podar Bros.*, 636 F.2d 75, 77 (4th Cir. 1981). Consequently, Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings — the award-enforcement stage.[16]

---

[16]It is possible that the Philippine arbitrator(s) will apply United States law with respect to the Jones Act and Seaman's Wage Act claims, or that Aggarao will be able to effectively vindicate the substance of those claims under Philippine law and obtain an adequate remedy. Indeed, the Liability Clause suggests that any payment for Aggarao's injuries under the POEA Contract cover his "claims [for] damages arising from the contract, tort, fault or negligence under the laws of the Philippines *or any other country*." J.A. 186 (emphasis added). The defendants have indicated, however, that they intend to argue, even under the Supreme Court's choice of law principles, that United States law should not apply. *See Lauritzen v. Larsen*, 345 U.S. 571 (1953) (enumerating factors to consider in determining whether shipowner is "employer" for purposes of Jones Act).

5.

Finally, Aggarao contends that, even if he is obliged to arbitrate his claims against MOL, the district court erred in concluding he was equitably estopped from pursuing his claims against World Car and Nissan because they are not signatories to the POEA Contract. Without a doubt, however, "a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." *Am. Bankers Ins. Group, Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006). As Judge Williams there recognized, "[o]ne such situation exists when the signatory is equitably estopped from arguing that a nonsignatory is not a party to the arbitration clause." *Id.* Most relevant here, the doctrine of equitable estoppel applies "'when the signatory to the contract containing the arbitration clause raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (alterations omitted)).

Although Aggarao maintains that MOL, World Car, and Nissan had separate roles in the injuries he suffered, and that each owed him distinct legal duties, his Complaint alleges that each was his "employer," and that it was "within the course and scope of his employment" that he sustained injuries "because of the unsafe and unseaworthy condition of [the Asian Spirit], fault, breach of agreement, violation of law, and negligence of *the Defendants*." J.A. 20-23, 25 (emphasis added). Indeed, Aggarao essentially alleges the *same* claims against MOL, World Car, and Nissan — unseaworthiness, maintenance and cure, breach of contract, violation of the Seaman's Wage Act, and negligence under general maritime law and the Jones Act — employing the *same* allegations as the bases for liability:

- The defendants were "negligent for failing to provide [Aggarao] with a safe place to work, a seaworthy vessel, appurtenances and personnel, and in furnishing defective equipment," J.A. 40, 42, 49, 51, 58, 60;

- "The injuries and impairments sustained by [Aggarao] were caused and contributed to, in whole or in part, by the negligence of [the defendants] through [their] officers, supervisors, agents, servants and/or employees, masters and officers of the M/V ASIAN SPIRIT, acting within the scope of their respective employment," *id.* at 41, 42, 50, 51, 59, 60;

- "The injuries and impairments sustained by [Aggarao] were proximately caused and/or substantially contributed to by the unseaworthiness of the M/V ASIAN SPIRIT," *id.* at 44, 53, 62;

- "To date, [the defendants have] failed to provide maintenance, cure and unearned wages as required," *id.* at 45, 54, 63; and

- The defendants have breached their "employment agreements with [Aggarao by failing to pay him his full wages due]," *id.* at 48, 57, 66.

Aggarao protests that the foregoing allegations are insufficient for equitable estoppel purposes, because his Complaint does not also allege "pre-arranged, collusive behavior demonstrating that the claims are intimately founded in and intertwined with the [arbitration] agreement at issue." *See Donaldson Co., Inc. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 735 (8th Cir. 2009) (internal quotation marks omitted). Although we have not specifically required allegations of collusion, we agree that, at a minimum, there must be allegations of "coordinated behavior between a signatory and a nonsigna-

tory" defendant, *id.* at 734, and that the claims against both the signatory and nonsignatory defendants must be "based on the same facts," be "inherently inseparable," and "fall within the scope of the arbitration clause," *see MS Dealer*, 177 F.3d at 947-48 (internal quotation marks omitted).

Aggarao's claims against MOL, World Car, and Nissan allegedly arose from the same "occurrence" or "incident," i.e., the tragic circumstances on the Asian Spirit in August 2008 resulting in his injuries. *See* J.A. at 27-28. The conduct of MOL, World Car, and Nissan was coordinated by virtue of each defendant's alleged involvement in that incident — instigating and contributing to one another. In the first place, MOL, apparently carrying out the orders of Nissan, directed the seamen of the Asian Spirit to make preparations to load its cargo while the ship was yet in the Chesapeake Bay, instead of in the Port of Baltimore where those tasks could be more safely accomplished. These unsafe conditions were said to be exacerbated by design defects in the Asian Spirit and its deck lifting machine, rendering World Car's ship unseaworthy. MOL, in turn, allegedly provided improper supervision to an inexperienced crew negligently operating the deck lifting machine — a crew that World Car had the responsibility to man. In short, Aggarao's claims against MOL depend, "in some part, upon the nature of tortious acts allegedly committed" by Nissan and World Car, and vice versa. *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398-99 (5th Cir. 2006) (affirming decision compelling plaintiff to arbitrate claims against nonsignatory parent company because claims were factually tied to claims against signatory subsidiaries).

Moreover, Aggarao emphasizes in his claims against MOL, World Car, and Nissan that his injuries occurred while he was acting in the scope of his employment. The POEA Contract sets forth terms and conditions of employment, including obligations to provide a seaworthy vessel, maintenance and cure, and wages. Hence, each of Aggarao's claims against Nissan, World Car, and MOL implicates, in some manner, the

POEA Contract. Consequently, each of his claims falls within the scope of the Arbitration Clause. We are thus satisfied — as was the district court — that the doctrine of equitable estoppel applies, and that Aggarao must arbitrate his claims against the signatory MOL as well as those claims alleged against the nonsignatories Nissan and World Car.[17]

B.

Although we affirm the district court's determination that the Arbitration Clause is enforceable, we reject its procedural disposition of the case — i.e., dismissal of the Complaint with prejudice and denial of the injunction request as moot. Contrary to the court's apparent supposition, it was not divested of jurisdiction once it concluded that Aggarao's claims were subject to arbitration in the Philippines. The Supreme Court in *Sky Reefer* explicitly recognized that a district court could, in foreign arbitration cases, properly retain jurisdiction after referring the parties to arbitration pursuant to the Convention Act. *Id.* at 540-41; *id.* at 542 (O'Connor, J., concurring) (explaining that "[f]oreign arbitration clauses of the kind presented here do not divest domestic courts of jurisdiction, unlike true foreign forum selection clauses"). Indeed, the Court emphasized that the plaintiff would be ensured a subsequent opportunity at a second arbitration-related court proceeding, the award-enforcement stage, to raise its public policy defense because the district court had retained jurisdiction. *Id.*

---

[17]Aggarao raises a concern that Nissan, a Japanese corporation, and World Car, a Liberian corporation, may not be subject to the jurisdiction of the arbitrator(s) in the Philippines. At oral argument, however, the defendants' eminently able lawyer, on behalf of MOL, Nissan, and World Car, agreed that his clients will submit to arbitration in the Philippines, and will not interpose any defenses they may possess concerning the timeliness of the arbitration. We are satisfied that Nissan and World Car will abide by those representations. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92 (1990).

Moreover, we have recognized that, "[w]hen a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA commands the federal courts to stay any ongoing judicial proceedings and to compel arbitration." *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999) (citations omitted). Although our *Hooters* decision addressed a district court's authority to stay proceedings pending arbitration under § 3 of the FAA — which applies specifically to arbitration agreements between citizens of the United States — that provision is equally applicable to actions subject to the Convention Act. As explained above, § 208 of the Convention Act incorporates those provisions of the FAA that are not in conflict with the Convention or the Convention Act. Because neither the Convention nor the Convention Act prohibits the issuance of a stay of proceedings, the authority conferred in § 3 of the FAA is incorporated into the Convention Act. *Cf. Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro*, 712 F.2d 50, 54-55 (3d Cir. 1983) (concluding that stay of proceedings pending arbitration "was in compliance with the Convention and the law of the United States").

Although we have acknowledged that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable," *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001), that is not the situation presented here.[18] Aggarao's public policy defense invok-

---

[18]There may be some tension between our decision in *Hooters* — indicating that a stay is required when the arbitration agreement "covers the matter in dispute" — and *Choice Hotels* — sanctioning dismissal "when all of the issues presented . . . are arbitrable." Our sister circuits are divided on whether a district court has discretion to dismiss rather than stay an action subject to arbitration. *Compare Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005) ("[T]he proper course of action when a party seeks to invoke an arbitration clause is to *stay* the proceedings pending arbitration rather than to dismiss outright."), *with Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration."). We need not resolve this disagreement because, even under *Choice Hotels*, dismissal is not appropriate where, as here, the issues are not all subject to arbitration.

ing the prospective waiver doctrine is not subject to arbitration, and he is unable to pursue that defense until after an arbitration award has been made. Hence, the district court was not constrained to dismiss this case. *See Sky Reefer*, 515 U.S. at 540 (observing with approval that district court possessed jurisdiction pending arbitration and would have opportunity at award-enforcement stage to consider plaintiff's public policy defense); *Nanosolutions, LLC v. Prajza*, 793 F. Supp. 2d 46, 53-54 (D.D.C. 2011) (staying action pursuant to FAA pending arbitration proceedings in Convention Act case).

As a corollary to the foregoing, the district court was not obliged to deny the injunction request as moot when it deemed Aggarao's claims to be arbitrable. We have recognized that the "hollow-formality" test may be applicable in such circumstances, explaining that,

> where a dispute is subject to mandatory arbitration under the [FAA], a district court has the discretion to grant a preliminary injunction to preserve the status quo pending the arbitration of the parties' dispute if the enjoined conduct would render that process a "hollow formality." The arbitration process would be a hollow formality where "the arbitral award when rendered could not return the parties substantially to the status quo ante."

*Merril Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1053-54 (4th Cir. 1985) (quoting *Lever Bros. Co. v. Int'l Chem. Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)). Although our *Bradley* decision, as well as its *Lever Bros.* predecessor, addressed disputes subject to the FAA only, a court's authority to entertain an injunction request that passes the hollow-formality test applies to Convention Act cases as well. Again, § 208 of the Convention Act incorporates the FAA provided it does not conflict with the Convention or the Convention Act. As the Fifth Circuit has

recognized, "nothing in the Convention or [the Convention Act] limits the inherent authority of a federal court to grant injunctive relief with respect to a party over whom it has jurisdiction." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003); *see also Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822, 826 (2d Cir. 1990) (recognizing that "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to § 206 [of the Convention Act]").[19] Accordingly, the district court erred in failing to exercise its discretion when it denied the injunction request as moot. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993); *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 979-82 (9th Cir. 2010) (concluding that court "abused its discretion" in "finding as a matter of law that it lacked the power to grant injunctive relief"). The court had the authority — and will again on remand — to apply the hollow-formality test and assess whether Aggarao's injunction request should be entertained.

---

[19]Our 1981 decision in *Podar Bros.*, *supra* at Part III.A.4., does not foreclose application of the hollow-formality test in this case. Indeed, the defendants make no such contention. We determined in *Podar Bros.* that a district court lacked authority to issue a prejudgment attachment because it was "contrary to the parties' agreement to arbitrate and the Convention." 636 F.2d at 77. We deemed the attachment contrary to the Convention in reliance on the Third Circuit's decision that article II(3) of the Convention completely ousts a district court of jurisdiction, other than the power to "refer the parties to arbitration." *See McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032, 1038 (3d Cir. 1974); *but see Rhone*, 712 F.2d at 55 (subsequent Third Circuit decision recognizing court's authority to stay action pending arbitration under Convention). The decision in *McCreary*, however, predates *Sky Reefer* where the Supreme Court endorsed a district court's retention of jurisdiction over a dispute subject to arbitration under the Convention Act. Because the Supreme Court has rejected the *McCreary* premise, *Podar Bros.* has been effectively overruled by the Court on the jurisdictional point and is not controlling precedent with respect to Aggarao's injunction request.

## 1.

### a.

When Aggarao made his injunction request there were genuine issues of material fact regarding whether the defendants had provided adequate maintenance and cure to him and, relatedly, whether he was fit to be repatriated to the Philippines. Aggarao insisted that MOL and World Car had breached their obligations under general maritime law to provide him maintenance and cure "until he reache[d] maximum medical recovery." *See Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962).[20] In response, the defendants did not deny that MOL had an obligation to provide maintenance and cure for Aggarao in the United States, but contended that their obligation ended on December 4, 2008, when, according to the paralegal's hearsay declaration, Dr. York said that Aggarao was fit to be repatriated to the Philippines.[21] The defendants asserted that, under the Liability Clause, MOL was to provide Aggarao "surgical and hospital treatment as well as board and lodging *until [he was] declared fit to work or to be repatriated*." J.A. 186 (emphasis added).[22] The defendants pointed

---

[20]Maintenance has been defined as "the right to sustenance and unearned wages for the period from the onset of the injury to the end of the voyage; cure is the right to medical care until the seaman reaches the point of maximum cure." *Martin*, 560 F.3d at 221.

[21]The defendants argued that World Car, the Asian Spirit's owner, never had an obligation to provide maintenance and cure because, when the employer and shipowner are separate entities, only the employer (MOL) bears that obligation.

[22]Under general maritime law, a seaman's fitness for repatriation is not determinative of his right to maintenance and cure; rather, the obligation to provide maintenance and cure persists until he "attains 'maximum cure,' defined as the point at which he is either cured or his condition is diagnosed as permanent and incurable." *Del. River & Bay Auth. v. Kopacz*, 584 F.3d 622, 632 (3d Cir. 2009); *Carleno v. Marine Transp. Lines, Inc.*, 317 F.2d 662, 665-66 (4th Cir. 1963) (holding maintenance and cure "is fulfilled when subsistence and medical care are furnished to the point where remedial medicine and surgery can do no more"). Even in cases of permanent disability, maintenance and cure is required where palliative care would improve the seaman's condition. *See In re RJF Int'l Corp. for Exon. from or Limitation of Liab.*, 354 F.3d 104, 107 (1st Cir. 2004).

out that, although they had completely cut off assistance to Aggarao for nearly a year, he had nonetheless found board and lodging and was still receiving medical care from UMMS. Accordingly, the defendants maintained that the injunction request sought not to preserve the status quo, but to demand relief on the merits of Aggarao's maintenance and cure claims.[23]

The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the "last uncontested status between the parties which preceded the controversy." *See Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions," but as the Tenth Circuit has explained, "[s]uch an injunction restores, rather than disturbs, the status quo ante." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004); *see United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10, (1st Cir. 1987) (determining

---

[23]We are not hesitant to observe the audacity of the defendants' assertions. As a result of their termination of maintenance and cure, Aggarao has essentially become a ward of the State of Maryland, dependent on its taxpayers and charities for his survival. If Aggarao is correct that MOL and World Car have breached their obligations to provide maintenance and cure, they ignore his request at their peril. We reiterate that "[t]he obligation to pay maintenance and cure arises under maritime law whenever the seaman is injured, regardless of any negligence or fault on the part of the owner or employer." *Martin*, 560 F.3d at 221. Moreover, any "ambiguities or doubts" as to a seaman's right to receive maintenance and cure "are to be resolved in favor of the seaman." *Vaughan*, 369 U.S. at 532. Otherwise, "[t]he shipowner's willful, arbitrary failure to pay maintenance and cure gives rise to damages that include a reasonable attorney's fee." *Williams v. Kingston Shipping Co., Inc.*, 925 F.2d 721, 723 (4th Cir. 1991). Indeed, "[i]f the failure to give maintenance and cure has caused or aggravated an illness, the seaman['s] recovery in such circumstances include[s] not only necessary expenses, but also compensation for the hurt." *Id.* (internal quotation marks omitted).

that injunction requiring insurance premium payments was not "mandatory" but "prohibitory" because during "last uncontested status" defendant had paid premiums) (Breyer, J.). Hence, the district court is entitled to apply the hollow-formality test to Aggarao's injunction request and determine whether an arbitral award in his favor in the Philippines might be an empty one, if maintenance and cure is not restored in the interim.

b.

The district court is also empowered to assess the second aspect of the injunction request, that Aggarao remain in the United States pending arbitration because he is not fit to be repatriated to the Philippines, or because he will not receive adequate medical care in that country. Obviously, Aggarao cannot be returned to the status quo ante if his repatriation to the Philippines for the arbitration proceedings might result in his demise, or if the lack of adequate medical care there would prejudice his already debilitated condition. Therefore, in evaluating whether the injunction request passes the hollow-formality test, the court should decide whether Aggarao is fit to be repatriated and, if so, whether he can receive adequate medical care in the Philippines without severely jeopardizing his life and health.[24]

---

[24]Although Aggarao's situation is unique, this Court confronted similar circumstances more than fifty years ago in *Ieronimakis v. Spence*, 257 F.2d 874 (4th Cir. 1958). In *Spence*, a Greek seaman who had contracted tuberculosis aboard a Liberian vessel which had come to port in Norfolk, Virginia, sued the shipowner for maintenance and cure. An immigration officer sought to have the seaman returned to Greece, pursuant to 8 U.S.C. § 1283, requiring the removal of alien crewman afflicted with certain diseases once the immigration officer determined "that it [would] not be possible within a reasonable time to effect a cure." There, as here, the shipowner agreed to bear the expense of repatriation and provide proper medical care to the seaman in his native country "until he reached his maximum state of cure." *See Spence*, 257 F.2d at 876. We observed that the court "acted properly in requiring such a pledge" from the shipowner.

The parties have presented conflicting medical opinions on both these questions. On remand — in the absence of an agreement by the parties — the district court should weigh these conflicting opinions and, if warranted, receive supplemental evidence. *Cf. Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (observing that whether seaman "has reached maximum cure . . . is a medical question, not a legal one").[25] If the court determines that Aggarao is either not fit to be repatriated to the Philippines or that he cannot receive adequate medical care there, it should exercise its discretion and rule on that aspect of the injunction request.[26]

2.

Irrespective of the outcome of the injunction request, the court should stay this case pending the arbitration proceedings to ensure that Aggarao will have an opportunity at the award-enforcement stage for judicial review of his public policy

---

*Id.* at 877. We affirmed the court's decision to defer to the immigration officer, however, because we "[could not] say that [the seaman's] repatriation was ordered without due regard for his safety. The Immigration Officer acted only after being advised that the seaman was 'fit for travel.'" *Id.* at 878. We nevertheless acknowledged the seaman's objection as to "the competency of the Greek hospitals" and agreed that the immigration officer "should consider as one of the circumstances the facilities for treatment there and here, along with the nature of the disease, and the probable length of time necessary to effect a cure." *Id.* at 877.

[25]Aggarao informs us that he "has been hospitalized for the past 16 months with a chronic staph infection, which has infected the bones of his spine with osteomyelitis, which the physicians have been unable to cure." Reply Br. of Appellant 21. He has moved for leave to supplement the record on appeal with medical records detailing his medical history since this appeal was initiated. Because the district court will assess his injunction request in the first instance, we are satisfied to deny Aggarao's motion to supplement the record.

[26]If the court authorizes Aggarao to remain in the United States during the arbitration proceedings, the parties may make arrangements for him to remotely participate therein.

defense based on the prospective waiver doctrine. We recognize that the Ninth and Eleventh Circuits have surmised that a plaintiff's access to a federal court in this country should be virtually guaranteed following foreign arbitration proceedings. *See Lindo*, 652 F.3d at 1279-80; *Balen*, 583 F.3d at 654.[27] Although Aggarao could conceivably initiate a new court proceeding following arbitration, staying this action removes any doubt that, if necessary, he will have a full opportunity for judicial review of his public policy defense. *See Sky Reefer*, 515 U.S. at 540-41 (observing that there would be subsequent opportunity for review because district court had "retained jurisdiction"); *id.* at 542 (O'Connor, J., concurring in the judgment) (agreeing that prospective waiver question was "premature" because district court had "retained jurisdiction"). This approach is also consistent with the Convention, which contemplates a court retaining jurisdiction to ensure that an arbitration award comports with the public policy of the forum country. *See Mitsubishi*, 473 U.S. at 638 (observing Convention "reserves to each signatory country the right to refuse enforcement of an award where the recognition or enforcement of the award would be contrary to the public policy of that country" (internal quotation marks omitted)).

## IV.

Pursuant to the foregoing, we affirm the district court's judgment that the Arbitration Clause is enforceable and that Aggarao must arbitrate his claims against the defendants in the Philippines. We nevertheless vacate the dismissal of this

---

[27]The Eleventh Circuit suggests that, even when "a zero-dollar arbitral award is entered," a plaintiff should be able to interpose the public policy defense when the defendant moves to enforce the award in federal court, or after the plaintiff initiates a "separate action under federal law" in *any* district court. *Lindo*, 652 F.3d at 1279 n.23 & 1280 (citing 9 U.S.C. §§ 203, 206, 207). The Ninth Circuit similarly supposes that a dissatisfied litigant would "be free to return to the [same] district court [that enforced arbitration, and then] move to set aside the arbitration award." *Balen*, 583 F.3d at 654.

case and remand for reinstatement thereof, for assessment of the injunction request, for entry of a stay pending arbitration, and for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*